**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ANTERIOR ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| RAMEH AHMAD,<br><br>Plaintiff,<br>v.<br><br>NOVO NORDISK, INC., and<br>NOVO NORDISK A/S, | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: |

**<u>COMPLAINT AND JURY DEMAND</u>**

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the Unites States District Court for the Eastern District of Pennsylvania as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors:

<u>X</u> Plaintiff currently resides in Huntingdon Valley, Pennsylvania.

X Plaintiff purchased Defendants' products in Huntingdon Valley, Pennsylvania and used Defendants' products in Huntingdon Valley, Pennsylvania.

___ The Original Venue is a judicial district in which Defendants reside, and all Defendants are residents of the State in which the district is located (28 U.S.C. § 1391(b)(1)).

X The Original Venue is a judicial district in which a substantial part of the events or omission giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)): the products at issue here were sold and used in the Original Venue and Plaintiff suffered his injuries in the Original Venue.

___ There is not district in which an action may otherwise by brought under 28 USC §1391, and the Original Venue is a judicial district in which Defendants are subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

___ Other reason (please explain): ________________________________.

Plaintiff, Rameh Ahmad, by and through the undersigned counsel, brings this complaint against Defendants Novo Nordisk A/S and Novo Nordisk Inc., (hereinafter "Defendants" or "Novo Nordisk"), for damages suffered by Plaintiff, who was severely injured as a result of Defendants' widespread marketing of its drug, Ozempic, and his subsequent use of Ozempic, an injectable prescription

medication that is approved for improvement of blood sugar (glucose) in adults with type 2 diabetes, and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. At all relevant times hereto, Plaintiff Rameh Ahmad was a resident and citizen of the state of Pennsylvania in the county of Montgomery.

2. Plaintiff was prescribed and took Ozempic as directed by his physicians.

3. As a result of Plaintiff's use of Ozempic, Plaintiff developed Non-Arteritic Anterior Ischemic Optic Neuropathy ("NAION") and suffers severe physical and emotional injuries and radical changes to his lifestyle given his severe loss of sight.

4. Defendant Novo Nordisk A/S is and at all relevant times has been a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsværd, Denmark.

5. Novo Nordisk Inc. is a Delaware corporation that has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

6. Upon information and belief, Defendants failed to warn physicians and the end users of Ozempic of the complications and devastating effects of which the companies knew or should have known, including NAION, which can result in blindness and permanent vision loss.

7. Upon information and belief, Defendants failed to warn the end users of Ozempic of the complications and devastating effects of NAION, which the companies knew or should have known.

8. Upon information and belief, Defendants' marketing was deceptive and misleading about the true risks associated with the use of Ozempic, risks which the companies knew or should have known.

## BACKGROUND

### I. An Accidental Blockbuster: The Development of Ozempic

9. In the early 1990s, Novo Nordisk researchers discovered that when they injected rats with a chemical compound known as liraglutide—a GLP-1 ("glucagon-like peptide-1") agonist—the drug caused the rats to stop eating almost entirely.[1]

10. GLP-1 agonists are a class of medications that can help lower blood sugar levels and promote weight loss.[2] An agonist is a manufactured substance that attaches to a cell receptor and causes the same action as the naturally occurring substance.[3] Thus, GLP-1 agonists work by mimicking a naturally occurring GLP-1 hormone.

[1] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).
[2] https://my.clevelandclinic.org/health/articles/13901-glp-1-agonists (last visited Feb. 5, 2026).
[3] https://my.clevelandclinic.org/health/articles/13901-glp-1-agonists (last visited Feb. 5, 2026).

11. To describe the process in other words, GLP-1 medications bind to GLP receptors to trigger the effects (or roles) of the GLP-1 hormone. The higher the dose of the GLP-1 agonist, the more extreme the effects.[4]

12. "These rats, they starved themselves," said one Novo Nordisk scientist, Lotte Bjerre Knudsen, in a video series released by the Novo Nordisk Foundation, "so we kind of knew there was something in some of these peptides that was really important for appetite regulation."[5]

13. Later testing in human subjects revealed that those who received an intravenous drip of GLP-1 agonist ate 12% less at a lunch buffet than those who got a placebo.[6]

14. Consequently, Novo Nordisk decided to study liraglutide as not only a diabetes drug, which had been shown to lower blood sugars, but also as a drug to treat obesity.[7]

---

[4] https://my.clevelandclinic.org/health/articles/13901-glp-1-agonists (last visited Feb. 5, 2026).
[5] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).
[6] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).
[7] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).

15. Years later, in 2010, liraglutide was approved for the treatment of Type 2 diabetes by the FDA under Novo Nordisk's brand name Victoza,[8] at which point Novo Nordisk moved forward with studying the drug for weight loss.[9]

16. After clinical trials, in 2014, the FDA approved liraglutide as a daily injectable for treatment of obesity under Novo Nordisk's brand name, Saxenda.[10]

17. Saxenda's effects on weight loss, however, were modest; patients lost about 5% of their weight.[11]

18. In an effort to find ways to make a longer-lasting GLP-1 agonist so patients would not have to inject themselves every day, Novo Nordisk created a new molecule with the chemical name semaglutide.[12]

19. Novo Nordisk branded semaglutide as Ozempic, and on December 5, 2016, Novo Nordisk announced submission of Ozempic's New Drug Application (NDA) to the FDA for regulatory approval of a once-weekly injectable, in 0.5 mg or 1 mg doses, for treatment of Type 2 diabetes. In the announcement, Defendants represented that in clinical trials "once-weekly" Ozempic had a safe and well-

[8] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2957743/ (last visited Feb. 5, 2026).
[9] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).
[10] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).
[11] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).
[12] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).

tolerated profile, and Defendants represented that the most common adverse event was nausea.[13]

20. On December 5, 2017, the FDA approved the Ozempic NDA and granted premarket approval as NDA 209637.[14]

21. In addition to diabetes control, Ozempic also caused 15% weight loss, which was three times the loss caused by its predecessor, Saxenda.[15]

22. Just one year after Ozempic's approval for diabetes, Defendants began clinical trials with semaglutide in patients who were overweight or suffered from obesity.[16]

23. The results of the trials demonstrated that for participants who were overweight or obese, 2.4 mg of semaglutide, once weekly, plus lifestyle intervention was associated with sustained, clinically relevant reduction in body weight.[17]

24. On March 20, 2019, Defendants submitted a supplemental new drug application (sNDA) for Ozempic 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established

[13] https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (last visited Feb. 5, 2026).
[14] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/209637s000ltr.pdf (last visited Feb. 5, 2026).
[15] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).
[16] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).
[17] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last visited Feb. 5, 2026).

cardiovascular disease.18 On January 16, 2020, the FDA approved this new indication.[19]

25. By March of 2021, Defendants had completed the clinical trial studying semaglutide for weight loss, and its results were published March 18, 2021.[20]

26. In addition to the results, the published study, which was funded by Defendants, argued: "Obesity is a chronic disease and global public health challenge."[21]

27. Then, on May 28, 2021, Defendants submitted another sNDA requesting approval for a higher, 2 mg dose of Ozempic injection. On March 28, 2022, the FDA approved this request.[22]

28. In its press release, Defendants represented Ozempic as having "proven safety and efficacy" and Defendants continued to advertise that "it can help many patients lose some weight." As with its prior press releases, Defendants disclosed Important Safety Information and provided links to the Medication Guide and Prescribing Information. However, severe gastrointestinal events, including

---

[18] https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited Feb. 5, 2026).
[19] https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/209637s0031bl.pdf (last visited Feb. 5, 2026).
[20] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last visited Feb. 5, 2026).
[21] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last visited Feb. 5, 2026).
[22] https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/209637Orig1s009lbl.pdf (last visited Feb. 5, 2026).

gastroparesis and gastroenteritis, were not identified as risks. Nor was there any disclosure about risks of vision loss, including NAION.[23]

29. On September 22, 2023, Novo Nordisk added "ileus" under Section 6-3 Postmarketing Experience of the Prescribing Information ("PI" or "label") in a revised Ozempic label.

30. The new label listed ileus as an adverse reaction reported during post-approval use of semaglutide, the active ingredient in Ozempic.[24]

31. On September 6, 2024, the FDA notified Novo Nordisk of new safety information that it determined should be included in the labeling for GLP-1 RAs pertaining to the risk of pulmonary aspiration during general anesthesia or deep sedation.

32. On October 4, 2024, Novo Nordisk submitted a supplemental new drug application (sNDA 209637/S-032) and amendments for Ozempic incorporating the FDA's required safety modifications to the label.

33. On November 1, 2024, the FDA provided supplemental approval for sNDA 209637/S-032.[25]

---

[23] https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited Feb. 5, 2026).

[24] Ozempic Label (dated 9/22/23), available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/209637s020s021lbl.pdf.

[25] https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/209637s032lbl.pdf (last visited Feb. 5, 2026).

34. No version of the Ozempic label has warned patients or their doctors that taking Ozempic may cause NAION or result in permanent vision loss.

## II. Defendants Create a Market: Millions Spent on Marketing and Promotion Create a Media Frenzy and Mega Seller

35. Novo Nordisk was not permitted to market Ozempic for weight loss without FDA approval for that specific indication,[26] but before Ozempic ever received separate approval for treatment of weight loss, Novo Nordisk had already begun mentioning weight loss in its Ozempic commercials.[27]

36. On July 30, 2018, Novo Nordisk launched its first television ad for Ozempic to the tune of the 1970s hit pop song "Magic" by Pilot, wherein Novo Nordisk advertised that "adults lost on average up to 14 pounds" when taking Ozempic.[28]




---

[26] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).
[27] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).
[28] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).

37. Over the next five years, Novo Nordisk spent approximately $884,000,000 running television ads in the United States to promote its semaglutides, Ozempic and Wegovy, and its lesser-known oral GLP-1, Rybelsus, with most advertisements allocated towards Ozempic.[29]

38. Defendants also employed sophisticated use of social media to market Ozempic.

39. On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[30] and currently has over 1.2 billion views.[31]

40. On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[32]

41. Novo Nordisk reportedly spent approximately one hundred million dollars advertising Ozempic last year.[33] Ozempic ranked as the sixth most advertised prescription drug brand in 2022, with a U.S.-measured media spend of $181 million,

---

[29] https://medwatch.com/News/Pharma___Biotech/article15680727.ece (last visited Feb. 5, 2026).
[30] https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss.html (last visited Feb. 5, 2026).
[31] https://www.tiktok.com/tag/ozempic (last visited Aug. 1, 2023).
[32] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (last visited Feb. 5, 2026).
[33] https://www.newyorker.com/magazine/2023/03/27/will-the-ozempic-era-change-how-we-think-about-being-fat-and-being-thin (last visited Feb. 5, 2026).

according to Vivvix spending data and Pathmatics paid social data as reported in Ad Age Leading National Advertisers 2023.[34]

42. In 2023, over $491 million was spent advertising "diabesity" drugs, including Ozempic.[35]

43. Jimmy Kimmel joked about Ozempic at the Oscars.[36]

44. Howard Stern has joked about and discussed Ozempic.[37] Interestingly, Stern notes that the "catchy" theme song "distracts" the listener from actually hearing any of the listed side effects.[38]

45. Novo Nordisk has spent millions of dollars delivering their message to physicians, healthcare providers, and consumers.

46. For example, Novo Nordisk spent over $33,000,000 in 2022 on traditional physician marketing and detailing according to Open Payments Data.[39]

47. In sum, Novo Nordisk promoted the safety, efficacy, and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy

---

[34] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571?utm_source=exchange&utm_medium=email&utm_campaign=t5687390 (last visited Feb. 5, 2026).
[35] https://www.mmm-online.com/home/channel/spending-on-ozempic-wegovy-surges/ (last visited Feb. 5, 2026).
[36] https://www.usatoday.com/story/life/health-wellness/2023/03/13/ozempic-sweeping-hollywood-celebrities-weight-loss/11428801002/ (last visited Feb. 5, 2026).
[37] https://www.youtube.com/watch?v=QD-nCQn1Ads (last visited Feb. 5, 2026).
[38] https://www.youtube.com/watch?v=QD-nCQn1Ads (last visited Feb. 5, 2026).
[39] https://openpaymentsdata.cms.gov/company/100000000144 (last visited Feb. 5, 2026).

groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets.

48. However, throughout its marketing, Defendants failed to disclose the true serious side effects of Ozempic, including but not limited to permanent blindness.

### III. Marketing Works: Novo Nordisk's Rampant Promotion Results in Thousands of Prescriptions and Billions in Sales

49. As a result of Novo Nordisk's all-encompassing advertising and promotion efforts, Ozempic is widely prescribed throughout the United States.

50. As of August 10, 2023, Novo Nordisk reported that in the first six months of 2023 sales of Ozempic jumped 50% to more than $3.7 billion.[40]

51. In July of 2021, doctors in the U.S. wrote 62,000 prescriptions a week for Ozempic.[41]

52. It has been reported that the huge demand created by extensive marketing has led to rampant off-label usage and "gaming" the system to allow for insurance coverage.[42]

---

[40] https://www.cnbc.com/2023/09/09/big-pharma-blockbuster-obesity-drug-battle-is-headed-for-100-billion.html (last visited Feb. 5, 2026).
[41] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).
[42] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 5, 2026).

53. In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[43]

54. This surge has reshaped Denmark's economy as the country has reaped huge profits from the sale of the drug, which is now solely responsible for the country's economic growth.[44]

55. Ozempic has become so popular that Novo Nordisk has recently limited shipment to the U.S. and paused advertising while it addresses shortages.[45]

### IV. Defendants Have Long Known That Ozempic Is a Powerful, Dangerous Drug

56. As detailed below, Defendants knew from both pre-market and post-market research and analytics that Ozempic could cause malnutrition, cyclical vomiting, gastroparesis, gastroenteritis, intestinal obstruction/blockage, ileus, esophageal and bowel injury, DVT and associated pulmonary embolism, gallbladder problems necessitating surgery, and intraoperative aspiration.

57. Novo Nordisk has repeatedly failed to warn about the known dangerous side effects of Ozempic. This includes malnutrition, cyclical vomiting, gastroparesis, gastroenteritis, intestinal obstruction/blockage, ileus, esophageal and bowel injury, DVT and associated pulmonary embolism, gallbladder problems necessitating

---

[43] https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (last visited Feb. 5, 2026).
[44] https://www.nytimes.com/2023/08/28/business/denmark-ozempic-wegovy.html (last visited Feb. 5, 2026).
[45] https://www.theatlantic.com/health/archive/2023/05/ozempic-teen-obesity-treatment-health-promises-risks/674204/ (last visited Feb. 6, 2026).

surgery, and intraoperative aspiration. All of these conditions can, and have, led to hospitalization and/or death in patients across America.

58. Some doctors estimate that as many as 10% of patients discontinue use of these drugs due to the severity of side effects.[46]

59. Thousands of adverse event reports have been filed by the public with the FDA Adverse Event Reporting System. As of June 2022, the FDA has posted an alert that Ozempic has potential safety signals for intestinal blockage.[47]

60. On September 22, 2023, the FDA updated the label for Ozempic to include "ileus," the medical term for blocked intestines.[48]

61. Wegovy, chemically identical to Ozempic, already carried a warning on ileus.

62. As early as 2014, Defendants knew that Saxenda (liraglutide), Ozempic's predecessor, caused serious side effects and warned the end user of same.[49]

[46] https://www.cbsnews.com/news/ozempic-side-effects-weight-loss-drugs-wegovy-mounjaro-doctors-warn/ (last visited Feb. 6, 2026).
[47] https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/april-june-2022-potential-signals-serious-risksnew-safety-information-identified-fda-adverse-event (last visited Feb. 6, 2026).
[48] https://www.accessdata.fda.gov/scripts/cder/safetylabelingchanges/index.cfm?event=searchdetail.page&DrugNameID=2183 (last visited Feb. 6, 2026); https://www.healthline.com/health-news/fda-updates-ozempic-label-to-include-blocked-intestines-as-potential-side-effect (last visited Feb. 6, 2026).
[49] https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/206321orig1s000lbl.pdf (last visited Feb. 6, 2026).

63. As early as 2019, Defendants knew that Rybelsus (semaglutide), Ozempic's predecessor, caused serious side effects and warned the end user of same.

**V. Development of NAION and Its Sequela**

64. Anterior ischemic optic neuropathy ("AION") involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.

65. There are two types of AION: arteritic AION ("AAION") and non-arteritic AION ("NAION").

66. Non-arteritic anterior ischemic optic neuropathy ("NAION") is a medical condition involving damage to the optic nerve resulting in the loss of vision.

67. NAION is irreversible and permanent.

68. NAION falls within the category of eye stroke.

69. NAION is untreatable and can lead to permanent blindness.

70. While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve, typically without inflammation of the arteries.

71. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy, while 8-12% of patients may have accompanying pain such as a headache or periocular pain.

72. The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.

73. After glaucoma, NAION is the second most common cause of blindness due to optic nerve damage.

74. Some NAION patients lose complete vision with no recovery in the affected eye(s).

75. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blind in one eye, and certainly both eyes, results in bumps and falls and injuries related to the unseen impacts and accidents.

76. Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[50]

77. About 15% of patients who have NAION in one eye eventually develop it in their other eye.[51]

[50] Ischemic Optic Neuropathy, Cleveland Clinic (last reviewed 6/30/2024), available at https://my.clevelandclinic.org/health/diseases/ischemic-optic-neuropathy.
[51] Ischemic Optic Neuropathy, Cleveland Clinic (last reviewed 6/30/2024), available at https://my.clevelandclinic.org/health/diseases/ischemic-optic-neuropathy.

78. GLP-1 RAs are treated as a class by the FDA, and the class of drugs shares a similar mechanism of action, similar physiologic effects, and similar chemical structure.

79. It has been known since at least 2016 that the human eye contains GLP-1 receptors.

80. Defendants knew or should have known of the causal association between the use of Ozempic and the risk of developing NAION and its sequelae, but they ignored it.

81. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs.

82. The earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[52]

83. A meta-analysis of all clinical trials of GLP-1 RA drugs, including Novo Nordisk's own clinical trials, found a non-statistically significant increased risk of optic ischemic neuropathy.[53]

---

[52] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

[53] Silverii GA et al, Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials, Diabetes Obes Metab, 2024, available at https://dom-pubs.pericles-prod.literatumonline.com/doi/10.1111/dom.16076.

84. The authors note that optic ischemic neuropathy is rare and may have been underreported in clinical trials, leading to a lower estimated risk.

85. The overall rate of optic ischemic neuropathy was higher in the treatment group than the control group: 5.6 and 3.0 cases per 100,000 patient-years, respectively. The authors also note that "inappropriate use of drugs for inducing weight loss in moderately overweight patients with low cardiovascular risk could be associated with rare, but severe, adverse effects, possibly including NAION."

86. A Novo Nordisk spokesperson acknowledged that cases of NAION, which leads to severe and irreversible vision loss, were identified in Novo Nordisk's clinical trials.[54]

87. Defendants knew or should have known of the risk of NAION with use of Ozempic.

88. Defendants conduct clinical trials and have access to case reports and medical literature that provide them with superior knowledge compared to the general public as to potential risks of its medications.

89. For example, a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes

[54] Kevin Dunleavey, After studies flag possible link between Novo's Ozempic and rare eye disorder, Danish agency calls for probe, Fierce Pharma (Dec. 17, 2024), available at https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited Feb. 6, 2026). See also Naomi Kresge, Ozempic Link to Rare Vision Loss Risk Confirmed in Study, Bloomberg (Dec. 13, 2024), available at https://www.bloomberg.com/news/articles/2024-12-13/ozempic-link-to-rare-vision-loss-risk-confirmed-in-large-trial (last visited Feb. 6, 2026).

(SUSTAIN FORTE)," with results first submitted in August 2021, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event.

90. The event occurred within the Semaglutide 2.0 mg dosage group, which included 479 participants, which is significant given the low background incidence of NAION.

91. Clinical observations by astute neuro-ophthalmologists at the Harvard-affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on Ozempic led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

92. The study "Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide," authored by Hathaway et al., involved patients examined in the neuro-ophthalmology clinic between December 1, 2017, and November 30, 2023, and consisted of 17,298 patients, including 16,827 patients over the age of 12, 710 of which had type 2 diabetes (T2D), and 979 were overweight or obese. (Hathaway JT, Shah MP, Hathaway DB, et al., Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide, JAMA Ophthalmol. 2024;142(8):732-739).

93. Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications.

94. Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.

95. Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs. 1.8% (95% CI, 0%-3.5%) for the non-semaglutide cohort, and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs. the non-semaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; P < .001; concordance coefficient = 0.84).

96. Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs. 0.8% (95% CI, 0%-1.8%) for the non-semaglutide cohort, and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs. the non-semaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86).

97. The primary outcome of the Hathaway et al. study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified

by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."

98. Acknowledging the pathogenesis or cause of NAION remains unknown, the authors did not determine the mechanism in which semaglutide causes NAION; however, it was hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA-induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.

99. On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish-Norwegian cohort study" found an association between use of semaglutide for type 2 diabetes and the development of NAION. (Simonsen E, Lund LC, Ernst MT, et al., Diabetes Obes. Metab. (2025); 27(6): 3094-3103).

100. This cohort study compared the risk of NAION among individuals with type 2 diabetes using semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors (SGLT-2s), another diabetes medication. The authors concluded there is "an association between use of semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."

101. In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023, 106,454 of these patients were exposed to semaglutide and 67 developed NAION. (Grauslund J, Taha AA, Molander LD, et al., Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes, Int'l Journal of Retina and Vitreous (2024); 10(1):97). "Exposure to once weekly semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of observation for non-exposed." Id.

102. The study concluded use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."

103. The study also observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023."

104. Due to the findings of the two studies out of Denmark, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the European Medicines Agency and the Danish Medicines Agency required Novo Nordisk to review and submit available data related to semaglutide and NAION.

PRAC will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[55]

105. In response, Novo Nordisk has acknowledged cases of NAION were identified within their clinical trials.[56]

106. A recent case series published by Katz et al., "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP-1 RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION. (Katz BJ, Lee MS, Lincoff NS, et al., JAMA Ophthalmol. Published online January 30, 2025.)

107. The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.

108. The morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling, and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later,

---

[55] https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/ (last visited Feb. 6, 2026).
[56] https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited Feb. 6, 2026).

after which she experienced painful vision loss in her right eye. Imaging performed on the right eye was consistent with NAION.

109. A study published on April 7, 2025, analyzing FDA Adverse Event reports indicates increased reports of vision impairment linked to semaglutide use. Compared to other diabetes and weight loss medications, users of semaglutide showed "significantly higher" reports of vision impairment. (Massy, et al., Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data, BMC Medicine (2025) 23:203).[57]

110. Despite the growing number of articles, reports, and an investigation by PRAC, Defendants still provide no warnings about the dangerous side effect of NAION in conjunction with use of Ozempic.

**VI. Defendants' Continuing Failure to Disclose the Risk of NAION and its Sequela**

111. According to the Drugs@FDA website, the label for Ozempic has been updated on at least fourteen (14) occasions since 2017, with the most recent update on October 14, 2025. Despite the fact there are at least fourteen (14) iterations of the Ozempic label, Defendants' labels have not contained any warning or any

[57] Massy, et al., Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data, BMC Medicine (2025) 23:203, available at https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-025-04031-z.

information whatsoever on the increased propensity of Ozempic to cause NAION and permanent vision loss as suffered by Plaintiff.[58]

112. On June 6, 2025, the European Medicines Agency (EMA) recommended that the product information for semaglutide medicines including Ozempic, Wegovy, and Rybelsus include NAION as a side effect.[59]

113. To date, the Ozempic warning label is still devoid of any mention of NAION.

114. Furthermore, Defendants have failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Ozempic and/or Wegovy, monitoring of patients while on the medication, advising patients to cease use of the medication if they develop symptoms consistent with NAION, or after the fact so as not to risk the potential for injury in the other eye.

115. Nothing was or is stopping Defendants from adding a warning regarding the risk of NAION. Defendants could have at any time made "moderate changes" to the labels.

[58] See Drugs@FDA: FDA-Approved Drugs, Ozempic, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=209637 (last visited Feb. 6, 2026).
[59] https://www.ema.europa.eu/en/news/prac-concludes-eye-condition-naion-very-rare-side-effect-semaglutide-medicines-ozempic-rybelsus-wegovy (last visited Feb. 6, 2026).

116. Specifically, Defendants could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Ozempic's label without any prior FDA approval.

117. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation, such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." 21 C.F.R. § 314.70(c)(6)(iii).

118. On July 3, 2024, the Journal of the American Medical Association ("JAMA")—Ophthalmology published a study suggesting an association between semaglutide and NAION. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with type 2 diabetes taking semaglutide had a more than three times greater risk of developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide for overweight/obesity indications, the risk of developing NAION was nearly seven times greater than non-GLP-1 RA medications.

119. The JAMA study referenced a potential causal mechanism, proposing that "expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA

induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION."

120. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischaemic Neuropathy" reported in connection with use of GLP-1 RAs. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[60]

## PARTY PLAINTIFF

121. Plaintiff, Rameh Ahmad, is a resident of the State of Pennsylvania and is currently 48 years old.

122. On or around February 2025, Plaintiff was prescribed Ozempic 0.25 mg weekly for type 2 diabetes.

123. On or about December 5, 2025, Plaintiff presented to the emergency room with painless monocular temporal blurring, curtain over vision, new flashes and floaters, photophobia and double vision. He was diagnosed with Non-Arteritic Anterior Ischemic Optic Neuropathy.

---

[60] The FDA's Adverse Events Reporting System (FAERS) is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

124. On or about January 16, 2026, Plaintiff was evaluated by an ophthalmologist. It was recommended that he not restart Ozempic.

125. Plaintiff continues to suffer from blurred vision, vision loss, and floaters, which negatively affects his daily life, including his job.

126. As a result of using Ozempic, Plaintiff was caused to suffer from Non-Arteritic Anterior Ischemic Optic Neuropathy and its sequelae, which resulted in blurry vision, visual disturbance, optic nerve swelling, vision loss, and nerve pain.

127. At all times material to the above, the Ozempic label failed to adequately warn Plaintiff and his medical providers of the true risks of taking Ozempic, including developing/causing NAION.

128. At all times material to the above, the marketing and advertising failed to adequately warn Plaintiff and his medical providers of the true risks of taking Ozempic, including developing/causing NAION.

129. Plaintiff will likely never see clearly again as a result of his usage of Ozempic.

130. Defendants knew or should have known that use of semaglutide could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

131. Defendants continue to downplay the risk of NAION and have not changed or provided any warnings to the public and medical community.

132. Defendants' Ozempic was at all times utilized and prescribed in a manner foreseeable to Defendants.

133. Plaintiff used Ozempic appropriately and as prescribed and instructed and did not misuse or alter Ozempic in any unforeseeable manner.

134. Through its affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and his physicians the true and significant risks associated with Ozempic.

135. As a result of Defendants' actions, Plaintiff and his physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendants' conduct.

136. As a direct result of being prescribed and using Ozempic, Plaintiff has been permanently and severely injured.

137. As a direct and proximate result of his Ozempic use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money, and other economic losses including past and future medical expenses.

138. Plaintiff diligently investigated the potential cause of these injuries, but the relationship to Ozempic was not discovered, and through reasonable care and

diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

139. Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Ozempic, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for treatment.

140. Plaintiff's life is forever changed as a result of Defendants' actions and inactions.

**COUNT I**
**STRICT LIABILITY — FAILURE TO WARN**

141. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

142. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

143. Defendants, as the holder of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance and pharmacovigilance.

144. Defendants, as manufacturers, distributors, and marketers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Ozempic were inadequate.

145. Plaintiff did not have the same knowledge as Defendants and no adequate warning, other clinically relevant information, or data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

146. Defendants had a duty to provide adequate warnings and instructions for Ozempic, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their product.

147. Defendants had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Ozempic, as it became or could have become available to Defendants.

148. Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Ozempic, to health care providers

empowered to prescribe and dispense Ozempic to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendants misled and continue to mislead the medical community about the risk and benefit balance of Ozempic, which resulted in permanent injuries to Plaintiff.

149. Defendants knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Ozempic created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

150. Despite the fact that Defendants knew or should have known that Ozempic caused unreasonable and dangerous side effects, they continue to promote and market Ozempic without providing adequate clinically relevant information.

151. Defendants knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Defendants' failures.

152. The Ozempic supplied to Plaintiff by Defendants was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold. Defendants possessed knowledge and information confirming the defective and unreasonably dangerous nature of Ozempic but, despite this knowledge and information, Defendants failed and neglected to issue adequate

warnings that Ozempic causes serious and potentially irreversible vision issues, optic nerve damage, and NAION. Defendants have yet to issue any warnings or recommendations that patients taking Ozempic undergo ophthalmological monitoring.

153. Defendants' failure to provide adequate warnings or instructions rendered Ozempic unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendants, and in that the risk of danger outweighs the benefits.

154. Defendants continue to fail to provide adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

155. Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Ozempic including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

156. Defendants failed to provide adequate post-marketing warnings and instructions after Defendants knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

157. Defendants continued to aggressively promote and sell Ozempic, even after they knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drug.

158. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer losses in the future.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendants, as contained in the Prayer for Relief.

## COUNT II
## STRICT LIABILITY — DESIGN DEFECT

159. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

160. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed

this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

161. Defendants, as the holder of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance, and pharmacovigilance.

162. Defendants, as a manufacturer, designer, distributor, and marketer of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to the Plaintiff.

163. Ozempic is designed in such a way that posed an unreasonable risk of permanent vision loss and optic nerve injuries and was kept on the market despite being in a defective condition.

164. Defendants knew or should have known the Ozempic they developed, manufactured, labeled, marketed, sold, and/or promoted was defectively designed in that it posed a serious risk of severe and permanent vision and optic nerve injuries.

165. Defendants have a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

166. Defendants sold, marketed and distributed a product that is unreasonably dangerous for its normal, intended, and foreseeable use.

167. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Ozempic, a defective product which created an unreasonable risk to the health of consumers, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

168. The Ozempic supplied to Plaintiff by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendants, posing a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

169. The Ozempic taken by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it is sold.

170. The Ozempic taken by Plaintiff was in a condition not contemplated by the Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent vision loss and optic nerve damage.

171. Ozempic causes serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION, in one or both eyes, harming Plaintiff and other consumers.

172. Plaintiff, ordinary consumers, and prescribers would not expect a diabetes drug designed, marketed, and labeled for glucose control and marketed for its supposed health benefits and weight loss to cause irreversible vision issues and optic nerve damage.

173. The Ozempic supplied to Plaintiff by Defendants was defective in design or formulation in that its alleged benefits did not outweigh the risks of serious and potentially irreversible vision issues and optic nerve damage posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of Ozempic makes the product unreasonably dangerous.

174. Ozempic's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

175. The intended or actual utility of Ozempic is not of such benefit to justify the risk of optic nerve damage that may be irreversible and permanently disabling, thereby rendering the product unreasonably dangerous.

176. The design defects render Ozempic more dangerous than other drugs and therapies designed to control glucose and assist with weight loss and cause an unreasonable increased risk of injury, including, but not limited to, potentially irreversible vision issues and optic nerve damage.

177. Ozempic is defective and unreasonably dangerous to Plaintiff and other consumers in that, despite knowledge that Ozempic use could result in vision issues, Defendants failed to adequately test or study the drug, including but not limited to: pharmacokinetics and pharmacodynamics of the drug, its effects on vision and the optic disc, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

178. Defendants acted unreasonably in their design of Ozempic in that Defendants failed to adopt a safer design for the product that was practical, feasible, and otherwise a reasonable alternative design or formulation that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

179. Defendants knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Ozempic's defective design.

180. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing

conditions. The losses are either permanent or continuing, and Plaintiff will suffer losses in the future.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendants, as contained in the Prayer for Relief.

## COUNT III
## NEGLIGENT FAILURE TO WARN

181. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

182. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

183. Defendants, as the holder of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance, and pharmacovigilance.

184. Ozempic was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

185. Defendants owed Plaintiff and other Ozempic users a duty to exercise reasonable care in marketing, advertising, promoting, distributing, and/or selling Ozempic.

186. At all times material, Ozempic was used in a manner intended and/or foreseeable to Defendants.

187. A reasonable patient or consumer of Ozempic would expect the drug to be free of significant defects.

188. Defendants knew or had reason to know of facts establishing that Ozempic could cause NAION and failed to warn of the risk.

189. At all times relevant hereto, the defective nature of Ozempic was known to Defendants, or reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold Ozempic and not known to ordinary physicians who would be expected to prescribe the drug to their patients.

190. In disregard of its duty to timely warn consumers of health risks associated with Ozempic, Defendants committed one or more of the following negligent acts or omissions:

a. Failing to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that Ozempic was designed and/or manufactured in a way that could cause injuries and damages including permanent vision loss;

b. Failing to timely disclose to Plaintiff and Plaintiff's prescribing and treating physicians the risk of NAION;
c. Failing to timely warn Plaintiff and Plaintiff's physicians that a baseline eye exam should be performed and that monitoring was necessary.

191. At all relevant times, the label for Ozempic was inadequate because it did not warn and/or adequately warn of all possible adverse side effects of NAION and permanent vision loss.

192. At all relevant times, the label for Ozempic was inadequate because it did not warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including NAION.

193. The label for Ozempic was inadequate because it did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic.

194. Defendants' failure to warn of the above was the proximate cause of Plaintiff's injuries, harm, and economic loss, from which Plaintiff continues to suffer.

195. Defendants' failure to warn of the significant risks of Ozempic use prevented Plaintiff and Plaintiff's treating physicians from conducting a proper assessment of the risks and benefits of using Ozempic.

196. Had Plaintiff and/or Plaintiff's treating physicians been properly warned of the significant risks of Ozempic, Plaintiff would not have elected to begin and/or continue Ozempic.

197. Reasonable, safer alternative treatments were available to Plaintiff and/or Plaintiff's treating physicians had they been warned of the significant risks outlined herein.

198. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendants, as contained in the Prayer for Relief.

**COUNT IV**
**NEGLIGENCE**

199. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

200. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

201. Defendants, as the holder of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

202. At all relevant times, Defendants had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Ozempic, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

203. Defendants failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution and/or sale of Ozempic in that Defendants knew or should have known this drug created a high risk of unreasonable harm to Plaintiff and other users.

204. Defendants had no reason to believe that intended and foreseeable users of Ozempic, such as Plaintiff, would realize the potential harm from use of the product.

205. Defendants failed to exercise reasonable care to inform users, such as Plaintiff, of Ozempic's risk of serious and potentially irreversible vision issues and harm to the optic nerve.

206. Defendants breached their duty of care to the Plaintiff and Plaintiff's physicians, in the testing, monitoring, and pharmacovigilance of Ozempic.

207. In disregard of its duty, Defendants committed one or more of the following negligent acts or omissions:

a. Manufacturing, producing, overpromoting, formulating, creating, developing, designing, selling, and distributing Ozempic without thorough and adequate pre- and post-market testing of the product;
b. Manufacturing, producing, overpromoting, advertising, formulating, creating, developing, designing, and distributing Ozempic while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Ozempic;
c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Ozempic was safe for its intended use;
d. Failing to disclose and warn of the product defect to the medical community and consumers that Defendants knew and had reason to know that Ozempic was indeed unreasonably unsafe and unfit for use by reason of the product defects and risk of harm to its users;
e. Failing to warn Plaintiff, the medical and healthcare community, and consumers that Ozempic's risk of harm was unreasonable and

that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Ozempic;

g. Advertising, marketing, and recommending the use of Ozempic, while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with, and inherent in, the use of this product;

h. Representing that Ozempic was safe for its intended use when in fact Defendants knew and should have known the product was not safe for its intended purpose;

i. Continuing to manufacture and sell Ozempic with the knowledge that Ozempic is unreasonably unsafe and dangerous;

j. Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Ozempic so as to avoid the risk of serious harm associated with the use of semaglutide, and failing to design and manufacture Ozempic so as to ensure the drug was at least as safe and effective as other similar products;

k. Failing to design and manufacture Ozempic to be reasonably safe for its intended purpose in violation of objective safety standards;

l. Failing to ensure that Ozempic was accompanied by proper and accurate warnings about requiring baseline visual examinations and regular eye examinations while using the drug;

m. Failing to ensure that Ozempic was accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Ozempic and that use of semaglutide created a high risk of severe, permanent injuries to vision; and

n. Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Ozempic.

208. A reasonable manufacturer, designer, distributor, promoter, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

209. As a direct and proximate result of the Defendants' negligent testing, monitoring, and pharmacovigilance of Ozempic, Defendants introduced a product they knew or should have known would cause injury to the optic nerve, NAION and resulting serious and permanent injuries to an individual's vision, and Plaintiff has been injured catastrophically and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

210. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendants, as contained in the Prayer for Relief.

## COUNT V
## NEGLIGENT MISREPRESENTATION AND MARKETING

211. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

212. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

213. Defendants, as the holder of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

214. At all relevant times, Defendants negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information or omitted or failed to disclose material information concerning Ozempic, including, but not limited to, misrepresentations regarding the safety and known risks of Ozempic.

215. The information distributed by the Defendants to the public, the medical community, Plaintiff and Plaintiff's healthcare providers, including advertising campaigns, labeling materials, print advertisements, and commercial

media, was false and misleading and contained omissions and concealment of truth about the dangers of Ozempic.

216. Defendants' conduct had the capacity to deceive, and Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Ozempic and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers, to request, recommend, purchase, and prescribe Ozempic.

217. Defendants had a duty to accurately and truthfully represent and market to the medical and healthcare community, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Ozempic, including its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

218. Defendants made continued omissions in the Ozempic labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

219. Defendants made additional misrepresentations beyond the product labeling by representing Ozempic as a safe and effective treatment for glucose control and weight loss with only minimal risks.

220. Defendants misrepresented and overstated the benefits of Ozempic to Plaintiff, Plaintiff's treaters, and the medical community without properly advising them of the known risks of permanent vision loss.

221. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did, use Ozempic, thereby causing Plaintiff to endure severe and permanent injuries.

222. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were unable to associate the injuries sustained by Plaintiff with Plaintiff's Ozempic use before it was too late. Defendants knew or should have known that the Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendants.

223. Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Ozempic had the true facts not been concealed by the Defendants.

224. Defendants had sole access to many of the material facts concerning the defective nature of Ozempic and its propensity to cause serious and dangerous side effects.

225. At the time Plaintiff was prescribed and administered Ozempic, Plaintiff and Plaintiff's healthcare providers were unaware of Defendants' negligent misrepresentations and omissions.

226. Defendants failed to exercise ordinary care in making representations concerning Ozempic while they were involved in its manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because the Defendants negligently misrepresented Ozempic's risk of unreasonable and dangerous adverse side effects.

227. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by the Defendants, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of Ozempic.

228. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

229. As a direct and proximate result of reliance upon Defendants' negligent misrepresentations, Plaintiff suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn

money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendants, as contained in the Prayer for Relief.

## COUNT VI
## BREACH OF EXPRESS WARRANTY

230. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

231. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

232. Defendants, as the holder of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

233. Defendants expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendants and/or their authorized agents or sales representatives, in publications, labeling, the internet, and other

communications intended for physicians, patients, Plaintiff, and the general public, that Ozempic was safe, effective, and fit and proper for its intended use.

234. Ozempic materially failed to conform to those representations made by Defendants, in package inserts and otherwise, concerning the properties and effects of Ozempic, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Ozempic sold to Plaintiff.

235. Defendants expressly warranted that Ozempic was safe and well-tolerated. However, Defendants did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Ozempic was particularly dangerous to the well-being of Plaintiff and Plaintiff's vision.

236. Ozempic does not conform to those express representations because Ozempic is defective, not safe, and has serious adverse side effects.

237. Plaintiff and Plaintiff's physicians justifiably relied on Defendants' representations regarding the safety of Ozempic, and Defendants' representations became part of the basis of the bargain.

238. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendants' representations that Ozempic was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

239. Plaintiff's healthcare providers justifiably relied on Defendants' representations through Defendants' marketing and sales representatives in deciding to prescribe Ozempic over other alternative treatments on the market, and Plaintiff justifiably relied on Defendants' representations in deciding to purchase and use the drug.

240. Plaintiff purchased and used Ozempic without knowing that the drug is not safe and well-tolerated, but that Ozempic instead causes significant and irreparable vision loss and eye damage.

241. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendants, as contained in the Prayer for Relief.

## COUNT VII
## BREACH OF IMPLIED WARRANTY

242. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

243. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

244. Defendants, as the holder of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

245. Defendants were the seller of Ozempic and sold Ozempic to be taken for glucose control.

246. When Ozempic was prescribed by Plaintiff's physician and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

247. Defendants impliedly warranted their product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and used, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

248. Defendants breached their implied warranties of the Ozempic product because the Ozempic sold to Plaintiff was not fit for its ordinary purpose to help with glucose control.

249. Ozempic would not pass without objection in the trade; is not of fair average quality; is not fit for its ordinary purposes for which the product is used; was not adequately contained, packaged and labeled; and failed to conform to the promises or affirmations of fact made on the container or label.

250. Defendants' breach of their implied warranties resulted in use of the unreasonably dangerous and defective product by Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendants, as contained in the Prayer for Relief.

**COUNT VIII**
**VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**73 P.S. § 201-1 et seq.**

251. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

252. Plaintiff purchased and used Ozempic primarily for personal use and therefore suffered ascertainable losses as a result of Defendants' actions in violation of 73 P.S. § 201-1 et seq.

253. Had Defendants not made affirmative misrepresentations, material omissions, and engaged in the deceptive conduct described herein, Plaintiff would not have purchased Ozempic and would not have incurred damages.

254. Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, money from Plaintiff that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

255. Despite knowing the falsity and misleading nature of their claims, Defendants engaged in unconscionable commercial practices, deception, fraud, false promises, misrepresentation and/or the knowing concealment, suppression or omission of material facts relative to the safety and efficacy of Ozempic.

256. Defendants intended such actions to mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Ozempic.

257. Such actions did, in fact, mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Ozempic.

258. Defendants had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of Ozempic.

259. Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff,

constituted unfair and deceptive acts and trade practices in violation of 73 P.S. § 201-1 et seq.

260. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendants, as contained in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

2. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendants, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

3. Awarding Plaintiff the costs of these proceedings; and

4. Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues within this pleading.

**RESPECTFULLY SUBMITTED** this 30th day of September, 2026.

*/s/ Mitchell Theodore*
Mitchell Theodore
**CORY WATSON ATTORNEYS**
2131 Magnolia Ave. S.
Birmingham, Alabama 35205
Phone: (205) 328-2200
Fax: (205) 324-7896
mtheodore@corywatson.com
*Attorney for Plaintiff Rameh Ahmad*